# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3780 | **DATE** | 3/24/2003 |
| **CASE TITLE** | | Jac USA Inc vs. Precision Coated | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing is set for 04/08/03 at 9:45 a.m. For the reasons set out in the Memorandum Opinion and Order, Casagrande's Motion for Summary Judgment [100-1] is DENIED, PCP's Motion for Summary Judgment on its counterclaim that Jac has infringed its patent [96-1] is DENIED, Jac's Motion for Summary Judgment on PCP's counterclaim [101-1] is GRANTED, PCP's Motion for Summary Judgment on Jac's claim [97-1] is DENIED, and the Motions to Strike by Jac, PCP and Casagrande are DENIED [108-1, 117-1, 122-1.] Enter Memorandum Opinion and Order.

*Geraldine Soat Brown*

(11) X [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 25 2003 | | |
| | Notified counsel by telephone. | | | date docketed | | **133** |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | U.S. DISTRICT COURT CLERK | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 3/24/2003 | | |
| MW | courtroom deputy's initials | 03 MAR 24 PM 12: 07 FILED-ED TO | date mailed notice | MW6 mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | | |

Jac USA, Inc.,      )
     Plaintiff and Counter-Defendant      )
     )      **Case No. 00 C 3780**
v.      )
     )      **Magistrate Judge Geraldine Soat Brown**
Precision Coated Products, Inc.,      )
     Defendant and Counter-Plaintiff,      )
     )
Charles L. Casagrande,      )
     Defendant.      )

## MEMORANDUM OPINION AND ORDER

This case involves a dispute between Jac USA Inc. ("Jac") on one hand, and Charles Casagrande and his company Precision Coated Products ("PCP") on the other hand, over the sale of two-liner transfer tape, and PCP's claimed patent on a process to use two-liner transfer tape to make business forms with removable labels.[1] Jac alleges that PCP is engaging in various illegal and tortious business practices and that Casagrande has breached a prior settlement agreement. PCP counterclaims alleging that Jac has infringed PCP's patent on the process for making business forms with integrated pressure sensitive labels. Jac counter-counterclaims alleging the invalidity of PCP's patent. Before the court are four motions for summary judgment and three motions to strike certain portions of various filings.[2]

---

[1] In 2002, Jac was acquired by Avery Dennison Corp. In 2001, PCP changed its name to Strata-Tac.

[2] These consist of Jac's motion for summary judgment against PCP's counterclaim [dkt# 101]; PCP's motion for summary judgment in favor of its counterclaim [dkt# 96]; PCP's motion for summary judgment against Jac's claim [dkt# 97]; and Casagrande's motion for summary judgment against Jac's claim [dkt# 100]. Jac moved to strike a portion of the prayer for relief

133

## Jurisdiction

This case was originally filed in state court. It was removed to federal court by PCP. [Dkt# 1.] The facts pleaded and disclosed to date fail to demonstrate that the parties are diverse. Jurisdiction is proper, however under federal question and supplemental jurisdiction.

At the time this case was filed, Jac and PCP were both Illinois corporations and had their principal places of business in Batavia, Illinois. (PCP's LR Ans. ¶ 1; Jac's LR Ans. ¶¶ 1, 6.)[3] PCP remains an Illinois corporation with Batavia as its principal place of business. (PCP's LR Ans. ¶ 2.) Jac was subsequently purchased by Avery-Dennison. (*Id.* ¶ 1.) However, "diversity of citizenship

---

contained in PCP's reply to Jac's summary judgment motion, and to strike PCP's Supplemental Statement of Undisputed Facts. [Dkt# 117.] PCP also moved to strike certain of Jac's summary judgment submissions. [Dkt# 108.] Finally, Casagrande moved to strike certain portions of Jac's Statement of Additional Facts. [Dkt# 122.]

[3] The facts set out herein are taken from the parties' respective responses to the other parties' statements of undisputed fact filed pursuant to Local Rule 56.1. They are cited herein as follows:

- Precision Coated Products Inc.'s Answer to Jac's LR 56.1 Statement of Undisputed Material Facts [dkt# 110] ("PCP's LR Ans. ");
- Precision Coated Products, Inc.'s Assembled LR 56.1(a)(3) Statement of Material Facts In Support of Its Motion For Summary Judgement and In Response to Jac's Local Rule 56.1(3)(b) Statement of Additional Facts [dkt# 116]("PCP's LR Stmt.");
- Jac's Response to PCP's 56.1(a)(3) Statement of Undisputed Facts and Jac's Local Rule 56.1(b)(3)(B) Statement of Additional Facts Requiring the Denial of Summary Judgement [dkt# 112]("Jac's LR Ans.");
- Defendant Casagrande's Response to Jac's Local Rule 56.1(b)(3)(B) Statement of Additional Facts Requiring the Denial of Summary Judgement [dkt# 124]("Casagrande's LR Ans.");
- Jac's Response to PCP's Supplemental Undisputed Facts [dkt# 117]("Jac's Supp. Resp."); and
- Jac's Response to Casagrande's Local Rule 56.1(a)(3) Statement of Undisputed Facts ("Jac's Casagrande Resp.") and Jac's Local Rule 56.1(b)(3)(B) Statement of Additional Facts Requiring the Denial of Summary Judgement [dkt# 112] ("Jac's Additional Facts").

The appendices of exhibits and deposition testimony submitted by the parties are also cited herein.

jurisdiction . . . depends upon the status of the parties at the commencement of the suit and is not affected by subsequent events." *Factor v. Pennington Press, Inc.*, 230 F. Supp. 906, 909 (N.D. Ill. 1963).

In its complaint, Jac alleged that Casagrande was a "resident" of the United Kingdom, which he denied. (Casagrande's LR Ans. ¶ 7.) Casagrande does not state either his residence or his domicile in his Answer. In his statement of facts filed pursuant to Northern District Local Rule 56.1, however, he states he is "residing" in Florida and, at the time the action commenced, "lived" in the United Kingdom. (Jac's Casagrande Resp. ¶ 1.) "In federal law, citizenship means domicile not residence." *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992). Simply living somewhere is insufficient to render that place a person's domicile. Rather, "domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Thus "one can reside in one place but be domiciled in another." *Id.*

Federal question jurisdiction is set forth in 28 U.S.C. § 1331 (2003) which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 35 U.S.C. § 281 (2003) states, "A patentee shall have remedy by civil action for infringement of his patent." Similarly, 28 U.S.C. § 1338(a) (2003) provides, "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks." The Sherman Act, 15 U.S.C. § 1 *et. seq.*, makes illegal contracts, combinations and conspiracies in restraint of trade or commerce and monopolization, attempted monopolization and combinations or conspiracies to monopolize. A complaint that specifically invokes federal law such as the Sherman Act "'arises

3

under' federal law for purposes of § 1331." *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Phillip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999). Jac's First Amended Complaint specifically invokes the Sherman Act. (First Am. Compl. ¶ 35.)[Dkt# 35.]

Supplemental jurisdiction has been codified by 28 U.S.C. §1367 which provides that, with the exception of actions brought solely under 28 U.S.C. § 1332:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. §1367(a).

A district court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Jac raises four claims in its First Amended Complaint: (1) Breach of Contract Against Casagrande; (2) Violation of the Sherman Act Through Illegal Tying Arrangement; (3) Violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"); and (4) Tortious Interference With Prospective Economic Advantage. (First Am. Compl.) PCP's Counterclaim For Patent Infringement [dkt# 42] alleges that Jac is liable for contributory infringement and inducing others to infringe. Among other things, Jac's counter-counter claim [dkt# 45] seeks a declaratory judgment that Jac has not infringed PCP's patent, and that PCP's patent is invalid.

Jurisdiction is proper for Jac's Sherman Act claim, PCP's counterclaims and Jac's counter-counterclaims because they arise under federal law. 28 U.S.C. § 1331. Jurisdiction is proper for the remainder of Jac's claims under supplemental jurisdiction. No novel or complex issue of state law is raised as the state law issues involve only established principles of contract law and application of a statute with an established meaning. *See, e.g., Friedman v. Board of Education of Niles Township High School Dist. 219*, No. 97 C 9001, 1998 WL 102698 at *3. (N.D. Ill. Feb. 27, 1998)(Conlon, J.)(matters of first impression under Illinois law are novel and complex). Nor do the state claims predominate over the federal claims. In this case all of the claims raised by Jac and PCP arise out of the same dispute over the sale of two-liner transfer tape. They are thus derived "from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966). No exceptional circumstances appear to be present. *See, e.g., Ernst v. Roberts*, 225 F. Supp. 2d 781, 790 (E.D. Mich. 2002)(pendency of closely related case in state court and strong state interest in issue constitutes exceptional circumstances). Thus, the court has subject matter jurisdiction.

## Facts

Jac and PCP both produce and market two-liner transfer tape that is used to make business forms with pressure sensitive labels that are removable from the form. Two-liner transfer tape is marketed by Jac under the name Free Film and by PCP as Transtick. (Jac's LR Ans. ¶¶ 20, 62.)

### The Development of the Process for Making Business Forms With Integrated Labels

In 1993, Charles Casagrande, now the majority stockholder and president of PCP, and Tom

Yeager began to develop a process and product to create business forms with pressure sensitive integrated labels. (PCP's LR. Ans. ¶¶ 3, 5.) David Hickman, then the president of Jac, assisted in the development. (*Id.* ¶ 5.)[4] Casagrande and Yeager began their work while at United Stencil & Affixing Co. of St. Louis ("USA-SL") (Jac's Casagrande LR Resp. ¶ 13.) Casagrande owned 30 percent of USA-SL and Yeager owned 70 percent and managed its day-to-day operations. (*Id.* ¶¶ 11-12.) Although two-liner transfer tape previously existed, Yeagar and Casagrande's goal was to develop a special type of two-liner transfer tape that could be used for the process of making business forms with pressure sensitive integrated labels. (*Id.* ¶ 15.) This product, Free Film,

> consists of transfer adhesive stock having a first and second liner that sandwiches a layer of pressure-sensitive adhesive between them. Specifically, FREE FILM has 'two differentially released coated liners' meaning the liners have a different adhesive affinity, whereby one liner may be removed from the other liner such that a web of adhesive is disposed on the remaining liner.

(Jac's LR Ans. ¶ 26 (internal citations omitted).) Thus it can be used to produce, for example, "a single form that includes order, packing and/or billing information, a package label and sometimes a return label for the customer." (*Id.* ¶ 34 *quoting* Gills Dec., Exhibit 2, Jac's Ans., ¶ 9.)

In the early 1990's, Casagrande was also a minority shareholder in United Coating Technologies, Inc. ("UCT") which, among other things, slit and resold transfer tape products. (Jac's Casagrande Resp. ¶ 6.) Casagrande, who was aware of Jac through UCT, asked Jac if Jac could make a specialty transfer tape pursuant to Yeager and Casagrande's specifications. (*Id.* ¶ 16.) UCT began purchasing the two-liner transfer tape from Jac, slitting it and reselling it. (*Id.* ¶ 17.)

---

[4] Because PCP denied that statement without citing any materials relied upon in supporting that denial, the statement is deemed admitted. N.D. Ill. Loc. R. 56.1(b)(3)(A) and (B).

**The 1995 Agreement**

In late 1994, Jac and UCT were in the process of negotiating Jac's purchase of a list of

UCT's customers for two-liner transfer tape. (Jac's Casagrande Resp. ¶ 19.)  An agreement was

reached in May, 1995 (the "1995 Agreement")[5]

The 1995 Agreement is on Jac stationery, and is addressed to Steve McKillip of UCT. (1995

Agreement at JAC 00384.)  It provides, in relevant part:

> In connection with the desire of United Coating Technologies Inc. ('U.C.T.') to
> furnish sales leads to Jac U.S.A. Inc. ("Jac") in respect of Jac's Free Film product
> . . . we would be pleased to engage your services as a supplier of sales leads (the
> 'Services') on the terms and conditions set out hereinbelow, provided however that
> U.C.T. pays all outstanding Jac Canada Inc. invoices on or before May 7, 1995, the
> total of which is presently US $67,262.91, . . . and that U.C.T. together with Jac
> informs all of U.C.T.'s current Free Film customers as listed on Schedule B hereto
> (the 'Customers'), both verbally and in writing, that while Jac Canada Inc. has always
> been U.C.T.'s supplier of Free Film, U.C.T. has agreed with Jac that as of May 7,
> 1995 Jac will commence selling and invoicing Free Film and any other Jac or Jac
> Canada Inc. product to the Customers.
>
> . . .
>
> During and after the termination of this agreement Jac shall not be prevented by
> U.C.T. or the Intervenants hereto from selling Free Film or any Jac or Jac Canada
> Inc. product to the Customers or any customer whatsoever.  Neither U.C.T. nor any
> of the Intervenants hereto shall directly or indirectly promote, offer for sale, or sell
> any product similar to Free film to the Customers or any customer whatsoever for a
> period of five (5) years from the date of acceptance of this agreement.

(*Id.* at JAC 00384-385.)

Under the 1995 Agreement, Jac was to pay UCT a commission calculated as 50% of "Excess

Profits" on sales to former UCT Customers. (*Id.* at JAC 00385.)  The 1995 Agreement contains an

---

[5] The letter from David Hickman to Steve McKillip (dated April 12, 1995) is attached at Tab
3 to Casagrande's Ans. Appx. (hereinafter the "1995 Agreement at JAC ___.").

integration clause. (*Id.* at JAC 00386.) Casagrande and others initialed and signed the 1995 agreement as "Intervenants." (*Id.* at JAC 00387.) The clause preceding the Intervenants' signatures states, "We, the undersigned Intervenants, hereby intervene into the above agreement as of the date of the above-mentioned acceptance and agree to be bound by the agreement to the extent the same applies to us." (*Id.*) The parties dispute what role Casagrande had in the negotiation of the Agreement. (Jac's Casagrande Resp. ¶ 20.)

The 1995 Agreement had a term of five years from UCT's acceptance. (1995 Agreement at JAC 00386.) In 1996 and 1997, a dispute arose between Jac and UCT about commissions under the 1995 Agreement. (Jac's Casagrande Resp. ¶ 32.) The dispute and resulting lawsuit were settled in 1999 through a settlement agreement (the "Settlement Agreement.")[6] The Settlement Agreement terminated the 1995 Agreement and was declared to be a compromise of all disputes "of any nature and kind which may have arisen between UCT and JAC prior to the date of this [Settlement] Agreement." (*Id.* at JAC 00087.) Under the Settlement Agreement, Jac paid the sum of $110,000 in full satisfaction of any obligation that JAC might have to UCT and the Intervenants (now referred to as "Intervenors") under the terms of the 1995 Agreement as of the date of the Settlement Agreement. (*Id.* at JAC 00088.) The Settlement Agreement expressly provided:

> The following provision of the Free Film [1995] Agreement shall survive termination of that Agreement:
>
> During and after the termination of this agreement Jac shall not be prevented by U.C.T. or the Intervenants hereto from selling Free Film or any Jac or Jac Canada Inc. product to the Customers or any customer whatsoever. Neither U.C.T. nor any of the Intervenants shall directly or indirectly promote, offer for sale, or sell any product similar to Free Film to the Customers or any customer whatsoever for a

---

[6] The Settlement Agreement is attached at Tab 4 to Casagrande's Ans. Appx. (hereinafter "Settlement Agreement at JAC___.").

period of five (5) years from the date of acceptance of this agreement.

(*Id.* at JAC 00088-89.) The Settlement Agreement was dated April 1999 and signed by Casagrande.

(*Id.* at JAC 00087, 91.)

**The Patent**

Yeager and Casagrande filed patent application number 08/409,203 ("the '203 Application") on March 23, 1995 just prior to entering into the May 2, 1995 agreement with Jac. (PCP's LR Ans. ¶ 8.) That Application was abandoned. (*Id.*) On July 13, 1996, Yeager and Casagrande filed patent application number 08/683,359 ("the '359 Application") as a continuation of the '203 Application. (*Id.* at ¶ 9.) The '359 Application was also abandoned. (*Id.*) On December 24, 1997, Yeager and Casagrande filed a third application, number 08/998,397 ("the '397 Application") as a division of the '359 Application. (*Id.* at ¶ 10.) That application became patent number 6,068,037 ("the '037 Patent"), which was issued on May 30, 2000. ('037 Patent, attached at Tab B-1 to PCP's Appx. to Mot. Summ. J.) The '037 Patent covers a method for using two-liner transfer tape to make a business form with a removable pressure sensitive label. (*Id.* at Claim 1.)

Jac alleges that, following the initial patent application, the rights in the potential patent were assigned to USA-SL; that assertion is denied by PCP but not Casagrande. (PCP's LR Ans. ¶ 16; Casagrande's LR Ans. ¶ 22.) The parties agree that the potential patent rights were eventually transferred to Free Film LLC, which was partially owed by Casagrande. (*Id.*) In January, 2000, Free Film, LLC assigned the rights in the forthcoming '037 Patent to PCP. (PCP's LR Ans. ¶ 17.) In return, PCP issued a note for $950,000 to Free Film, LLC that was secured by a security agreement. (*Id.*) Casagrande owns just under 64% interest in PCP. (Jac's Casagrande Resp. ¶ 43.)

9

**Alleged Infringement**

In late 1999, after being notified by the Patent Office that the '037 Patent would be issued, but apparently prior to being assigned the rights in the '037 Patent, PCP notified its customers and competitors, including Jac, of the forthcoming patent. (PCP's LR. Ans. ¶ 11.) PCP informed Jac's customers that those who purchased two-liner transfer tape from PCP would be allowed to use the patented process without paying a separate royalty, although the parties dispute whether the royalty was waived or subsumed into the purchase price. (*Id.* ¶ 12.) Purchasers of two-liner transfer tape manufactured by other suppliers, such as Jac's Free Film, would be required to pay a royalty to PCP if they wished to use the '037 process. (*Id.* ¶ 13.) PCP maintains that Free Film is used exclusively to make business forms with integrated labels and has little or no utility outside the '037 process. (PCP's Reply Sup. Mot. Summ. J. on Jac's Claim at 4.)

Jac has "encouraged customers to buy Jac's transfer tape without obtaining a license from PCP." (Jac's LR Ans. ¶ 47.) It has instructed them how to use Free Film in the '037 process. (*Id.* ¶ 39.) It has also offered to indemnify customers against any PCP patent infringement claim. (*Id.* ¶ 48.)

**The Litigation**

On June 1, 2000, Jac sued Casagrande and PCP in the Circuit Court of DuPage County for breach of the Settlement Agreement. The case was subsequently removed to federal court. As noted above, Jac's amended complaint alleges breach of contract against Casagrande, illegal tying in violation of federal antitrust law, a violation of IUDTPA and tortious interference with prospective economic advantage against PCP. (First Am. Compl. ¶¶ 20-38.) PCP counterclaimed against Jac

for inducement and contributory infringement of the '037 patent through Jac's sale of Free Film. (PCP's Counterclaim for Patent Infringement.) Jac counter-counterclaimed alleging the invalidity of the '037 patent. (Jac's Answer, Aff. Defs., and Counter-counterclaim.)

**The Motions for Summary Judgment**

Jac has moved for summary judgment against PCP's counterclaim of patent infringement. Jac asserts four grounds for its motion: (1) That the '037 Patent is invalid based on prior art; (2) that the '037 Patent is invalid under the "on-sale" doctrine (that there were integrated labels made using the patented process over a year before the initial application for the '037 Patent was filed); (3) that PCP cannot prove direct infringement, inducement to infringe, or that Jac knew that its customers were infringing the '037 Patent; and (4) that PCP's claims are barred by the 1995 Agreement. (Jac's Mem. Supp. Mot. Summ. J.)[Dkt# 101, 102.]

PCP has moved for an entry of a judgment finding that Jac has infringed the '037 Patent. (PCP's Mot. Summ. J.)[Dkt# 96.] PCP has also moved for summary judgment in its favor on Jac's three claims against it: Count II for breach of the Sherman Act through illegal tying arrangement; Count III for violation of IUDTPA; and Count IV alleging tortious interference with prospective economic advantage. (PCP's Mot. Summ. J. on Counts II-IV.)[Dkt#97.]

Casagrande has moved for summary judgment in his favor on Jac's claim against him for breach of the Settlement Agreement. (Casagrande's Mot. Summ. J.)[Dkt# 100.]

## DISCUSSION

Summary judgment is proper under Fed. R. Civ. P. 56(c) if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003.) The burden is on the moving party to establish that there is no genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the non-moving party must respond with specific facts demonstrating the existence of a genuine issue. *Id.* In assessing whether a genuine issue of fact exists the court construes all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

I.   **Jac's Motion for Summary Judgment on the Ground That The Settlement Agreement Bars PCP's Patent Infringement Claims.**

The first issue to consider is Jac's argument that the Settlement Agreement bars PCP's counterclaim for patent infringement. If summary judgment is appropriately granted to Jac on that basis, a number of the other motions are moot.[7]

PCP's counterclaim for patent infringement alleges that two-liner transfer tape is a material part of the invention described in the '037 Patent and is used solely in the manufacture of integrated business labels. (PCP's Counterclaim ¶¶ 14-15.) It is PCP's position that Jac's two-liner transfer tape, Free Film, has only one use: as part of the process covered by the '037 Patent. (PCP's Resp.

---

[7] In their arguments, the parties refer to the 1995 Agreement. As discussed above, although the 1995 Agreement was terminated and superceded by the Settlement Agreement, the relevant language was re-incorporated verbatim into the Settlement Agreement from the 1995 Agreement. The court interprets the parties' arguments accordingly.

to Jac's Mot. Summ. J. at 5.)[Dkt# 109.] PCP further alleges that, by offering two-liner transfer tape for sale intending it to be used in practicing the process in the '037 Patent, Jac contributorily infringes and induces others to infringe the '037 Patent. (PCP's Counterclaim ¶¶ 16, 22.) PCP seeks, *inter alia*, a permanent injunction enjoining Jac from infringing the '037 Patent or selling products "that are likely to be found infringing, inducing infringement or contributing to the infringement of PCP's '037 Patent." (PCP's Counterclaim at 5.) In other words, PCP seeks an injunction precluding Jac from selling Free Film.

Under the 1995 Agreement Jac purchased UCT's current list of customers for Free Film (who were defined in the agreement as "Customers"). (1995 Agreement at JAC 00384.) In return, Jac agreed to pay UCT commissions for five years on sales made to the Customers. (*Id.* at JAC 00385-86.) There was no obligation on Jac's part to pay commissions on sales of Free Film to anyone other than the "Customers." (*Id.*) Jac obtained a promise that UCT and the Intervenants would not sell a competing product "similar to Free Film to the Customers or any other customer whatsoever" for a period of five years. (*Id.* at JAC 00385.) UCT and the Intervenants also promised not to "prevent" Jac's sale of Free Film or any other Jac product to the Customers or any other customer "during and after the termination of the agreement." (*Id.*) The agreement not to "prevent" Jac's sale of Free Film was repeated verbatim in the Settlement Agreement that extinguished all other obligations of the parties. (Settlement Agreement at JAC 00088-89.)

Jac argues that the language providing that UCT and the Intervenants shall not prevent Jac from selling Free Film or any Jac product to "any customer whatsoever" precludes PCP from enforcing the '037 patent against Jac's sales of Free Film. (Jac's Mem. Supp. Mot. Summ. J. at 15.)[Dkt# 102.] Casagrande argues to the contrary, that the purpose of that language was to allow

Jac to continue to sell to the Customers without paying commissions after the expiration of the agreement. (Casagrande's Mem. Supp. Mot. Summ. J. at 1, 5.) PCP argues that the Settlement Agreement does not bar PCP from enforcing its intellectual property rights and that the Settlement Agreement is not binding on PCP. (PCP's Resp. to Jac's Mot. Summ. J. at 15.)[Dkt# 109.]

Summary judgment is an appropriate vehicle for a court to use to interpret an unambiguous contract as a matter of law. *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002); *Lulich v. Sherwin-Williams Co.*, 799 F. Supp. 64, 66 (N.D. Ill. 1992) An unambiguous contract is one in which the meaning of the terms and the parties' intent can be discerned from the face of the document without resort to extrinsic evidence. *Lulich*, 799 F. Supp. at 66. Thus, interpretation of an unambiguous contract is a question of law for the court, and summary judgment should be granted based on the plain meaning of the contract itself. *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1988). On the other hand, an ambiguous contract is one that is *reasonably* and *fairly* susceptible to more than one meaning. *Id.* at 1334 (emphasis in original). If a contract is deemed ambiguous, then extrinsic evidence is used to determine which meaning the parties intended the contract to have. When the extrinsic evidence is undisputed, the interpretation is a question of law. If, however, the extrinsic evidence is in dispute, a question of fact exists and summary judgment is not appropriate. *Aetna Life Ins. Co. v. American Nat'l. Bank & Trust*, 956 F. Supp. 814, 816 (N.D. Ill. 1997).

The parties agree, and the Settlement Agreement provides, that Illinois law applies to the construction of the contracts at issue. (Settlement Agreement at JAC 00090.) "Under Illinois law, resolution of issues of contract dispute starts with an analysis of the terms of the contract. [citations omitted.] 'If the language [of the contract] unambiguously answers the question at issue, the inquiry

is over.'" *Kallman,* 315 F.3d at 735 (quoting *Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir. 1996)).

Jac cites *Black's Law Dictionary* as stating that the definition of "prevent" is to "hinder or impede." (Jac's Resp. Casagrande's Mot. Summ. J. at 9.) Casagrande argues, however, "The plain and obvious meaning of 'prevent' is 'stop' or 'bar' not 'interfere.'" (Casagrande Mem. Supp. Mot. Summ. J. at 11.) Casagrande and PCP argue that PCP's demanding royalties from Jac's customers and enforcing patent rights through a lawsuit does not "prevent" Jac from selling to its customers but only makes it more expensive for the customers to buy from Jac. Courts may "use dictionaries to determine the plain and ordinary meaning of unambiguous terms." *Canal Barge Co. v. Commonwealth Edison Co.,* No. 98 C 0509, 2002 WL 1264002 at *5 (N.D. Ill. June 3, 2002)(Nolan, M.J.). However finding meanings from dictionary definitions can be fraught with difficulty. The Seventh Circuit has noted that offering only "lexicographers' definitions of the individual words" is inappropriate as "dictionaries reveal a range of historical meanings rather than how people use a particular phrase in contemporary culture." *Te-Ta-Ma Truth Foundation - Family of Uri, Inc. v. World Church of the Creator,* 297 F.3d 662, 666 (7th Cir. 2002).

Looking at the disputed language in the context of the 1995 Agreement and the Settlement Agreement answers the question. The two possible meanings offered by Casagrande are insupportable in light of those Agreements taken as a whole. First, Casagrande argues that the "prevent" language served to clarify that Jac's obligation to pay commissions ceased upon the termination of the 1995 Agreement. (Casagrande's Mem. Supp. Mot. Summ. J. at 14-15.) Adopting this interpretation would have the effect of rendering other terms of the 1995 Agreement, both in the disputed paragraph and the rest of the contract, superfluous. If the "prevent" language only

15

established Jac's right to sell to former UCT Customers following the termination of the agreement, it need not operate "during" the agreement. Nor would it need to apply to "any customer whatsoever." Jac never incurred an obligation to pay commissions for sales to customers who were not previously UCT's Customers. Moreover, the 1995 Agreement established an obligation to pay commissions only during its five-year term. It would not be necessary to state both that commissions were due for five years and, in a separate paragraph, that no commission would be due after five years.

Casagrande also argues that the disputed paragraph was designed to make it clear that the 1995 Agreement superceded the previous agreements between UCT and Jac regarding customer sharing. (Casagrande's Rep. Supp. Mot. Summ. J. at 12-13.)[Dkt# 125.] However, the first paragraph of the 1995 Agreement states that the Agreement is conditioned on the renunciation of all rights under prior agreements. (1995 Agreement at JAC 00384.) Casagrande's interpretation of the "prevent" language would render this language duplicative.

Furthermore, neither of Casagrande's interpretations is consistent with the decision to incorporate, word for word, the "prevent" language in the Settlement Agreement, in which all other obligations between Jac and UCT were expressly extinguished.

The issue on Jac's motion is whether PCP, by suing for an injunction to prevent Jac from selling Free Film, is doing something that the signatories of the Settlement Agreement promised would not be done. The language of the Settlement Agreement "unambiguously answers the question at issue." *Kallman,* 315 F.3d at 735 (internal citations omitted). The injunction that PCP seeks would clearly prevent Jac from selling Free Film, and therefore is contrary to the express language of the Settlement Agreement, even under the definition advanced by Casagrande. The plain

16

and unambiguous meaning of the "prevent" language directs this conclusion, especially in light of its incorporation in the Settlement Agreement, signed in 1999, after all other relationships and obligations of Jac and UCT had been extinguished.

Jac points out that Casagrande has admitted that the enforcement of the patent right is a means of preventing Jac from selling Free Film. (Casagrande Dep. at 164/3-165/5, attached to Jac's LR Appx.) Casagrande argues that, although it is true that an injunction is contrary to the literal wording of the Settlement Agreement, Jac's interpretation of the Settlement Agreement distorts the parties' intention as a whole in entering into the 1995 Agreement and the Settlement Agreement, which was all about customers and commissions and not about patent rights. (Casagrande's Reply Supp. Mot. Summ. J. at 8-10.) However, the central object of both agreements was Jac's sale of Free Film, with some commissions to UCT under the 1995 Agreement, and with a final payment for all commission obligations under the Settlement Agreement. Casagrande admits that "a reading of the full agreement makes clear that the prevention language was added to allow Jac to continue selling or attempting to sell to customers . . . ." (Casagrande's Mem. Supp. Mot. Summ. J. at 2.) PCP's position that Free Film is a "material part" of the invention protected by the '037 Patent and that Free Film has no substantially non-infringing uses is directly contrary to that intention because it requires the conclusion that Jac is *never* entitled to sell Free Film unless the owner of the '037 Patent permits it.

Both PCP and Casagrande argue that the "prevent" language cannot bar enforcement of the '037 Patent because neither the Settlement Agreement nor the 1995 Agreement expressly transfers or licenses any patent rights. (*See, e.g.* PCP's Mem. Opp'n. Jac's Mot. Summ. J. at 7.) They stress the admission by Jac's then-president David Hickman that intellectual property rights were not

17

discussed during the negotiation of the 1995 Agreement. (Hickman Dep. at 388/3-389/5, attached at Tab 2 to Casagrande's LR Appx.) However, Casagrande was well aware of the patent application that he and Yeager had submitted in March 1995 preceding the May 1995 Agreement. Likewise, when the Settlement Agreement was negotiated in 1999, he was aware of the '397 Application, which had been submitted in 1997 and which was shortly to be issued as the '037 Patent. In light of PCP's position that Free Film is a material part of the invention covered by the '037 Patent and has *no other substantially non-infringing use* (which PCP supports with the affidavit of co-inventor Yeager (PCP's Ans. Appx., tab A)), the "prevent" language is meaningless unless interpreted as a covenant by UCT and the Intervenors not to sue Jac for selling Free Film. That covenant not to sue is in effect an implied license to Jac.

> In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention. In the words of the Supreme Court:
>
>> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.
>
> . . . [I]mplied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel. These labels describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion: an implied license. The label denotes the rationale for reaching the legal result.

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571,1580 (Fed. Cir. 1997) (internal citations omitted). In that case, the court concluded that Mitsubishi had proved that the entire course of conduct between the parties over a six-year period led Mitsubishi to infer consent to manufacture and sell the patented products. *Id.* at 1581-82.

18

> The record shows that Wang tried to coax Mitsubishi into the SIMM market, that Wang provided designs, suggestions, and samples to Mitsubishi, and that Wang eventually purchased SIMMS from Mitsubishi, before accusing Mitsubishi years later of infringement. We hold, as a matter of law, that Mitsubishi properly inferred consent to its use of the invention of Wang's patents.

*Id.* at 1582.

The court in *Cardiovascular Diagnostics, Inc. v. Boehringer Mannheim Corp.*, 985 F. Supp. 615 (E.D.N.C. 1997), *aff'd* 185 F.3d 882 (Fed. Cir. 1999), found an implied license in a situation similar to the present case. In that case, the parties had resolved an earlier dispute with an Amendment in which defendant BMC agreed that plaintiff CDI could use certain technology "with no limitation on the manufacture, use, sale or rights of others to manufacture, use or sell PT and PPT tests and systems as long as such tests and systems are sold to customers using [certain] analyzers." *Id.* at 617. Prior to that Amendment, BMC had acquired rights in two patents. *Id.* BMC subsequently informed CDI that its products infringed those patents. *Id.* BMC argued, as PCP and Casagrande do here, that it never granted any rights under the two patents and never intended to release CDI of compliance with the patents. *Id.* at 621. The court, after canvassing the federal case law, concluded that it had a unique situation. *Id.* However, applying the patent law principles of implied license, as well as principles of state contract law, the court concluded that the language was "plain." *Id.* at 622. "The unequivocal language of the Amendment allows CDI to use the technology with 'no limitation.'" *Id.* That language did not exclude any claims from any patents, whether or not CDI was aware of those patents at the time the Amendment was negotiated.

> To allow BMC to claim that the Agreement and Amendment give CDI rights to use the technology in the abstract, but, in practice, to preclude exercise of those rights under the '779 and '598 patents would, in fact, deprive CDI of the benefit of the bargain. ... As part of its relationship with CDI, BMC conceded, by the contractual

19

language, that CDI could use certain technology without BMC's interference. Therefore, the court finds that CDI is entitled to an implied license arising from the express terms of the contractual arrangement between BMC and CDI.

*Id.* at 625.

As stated in the *Wang* case, no formal language is necessary to create an implied license. Furthermore, a license in the form of a covenant not to sue need not necessarily convey any proprietary rights. The distinction between the license conveyed in a covenant not to sue and a license that conveys proprietary rights was explained in *Ortho Pharmaceuticals Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031 (Fed. Cir.1995), which discussed the consequences for standing to sue:

> A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right . . . 'In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly . . . . He has no property interest in the monopoly of the patent nor any contract with the patent owner that others shall not practice the invention.'

*Id.* at 1031 (quoting *Western Electric Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2nd Cir. 1930)). To have standing to sue another infringer, the court explained, the licensee must have been granted "some of the proprietary sticks from the bundle of patent rights." *Ortho Pharmaceuticals*, 52 F 3d at 1031. However, the fact that the licensee has not been granted any of the proprietary rights in the patent does not make the covenant not to sue unenforceable.

Contrary to Casagrande's argument, this interpretation of the Settlement Agreement does not mean that UCT, Casagrande and the other signatories are precluded from competing with Jac, nor does it constitute a "restrictive covenant" precluding PCP from enforcing the patent. The Settlement

Agreement applies only to *Jac's* sales of Free Film. There is nothing in the Settlement Agreement that precludes PCP from selling two-liner transfer tape nor asserting the '037 Patent against any alleged infringer except Jac.[8]

Having determined that the Settlement Agreement includes a covenant not to sue that is in effect a license to Jac, the next issue is whether PCP is bound by that license and whether Jac has pleaded it in such a way as to entitle Jac to summary judgment on PCP's counterclaim. PCP argues that Jac never asserted the Settlement Agreement as an affirmative defense, or pleaded the existence of a license as required by Fed. R. Civ. P. 8(c). In fact, Jac pleaded as an affirmative defense, "For the reasons stated in Jac's claim against PCP, PCP has unclean hands and is not entitled enforcement of its patent." (Jac's Ans. and Aff. Def.'s to PCP's Counterclaim.) Jac's First Amended Complaint pleads the terms of the 1995 Agreement and the Settlement Agreement, and specifically alleges that "PCP's assertion that if Jac sells Transfer Tape Products it is infringing PCP's process patent also constitutes interfering with Jac's customer relations" in breach of the 1995 Agreement and the Settlement Agreement. (Jac's First Am. Compl. ¶¶ 10-15, 22.) The claim that the Settlement Agreement allows Jac to sell Free Film is central to Jac's claims against Casagrande. (*Id.* ¶¶ 4, 10-15, 21.) Jac's Answer to PCP's Counterclaim gave sufficient notice to PCP that it was asserting the Settlement Agreement as an affirmative defense as well. *See* Fed. R. Civ. P. 8(b)(requiring only that defenses be asserted in "short and plain terms"); *Fort James Corp. v. Kimberly-Clark Tissue Co.,* No. 98 C 7834, 1999 WL 966144 at *2 (N.D. Ill. Oct. 8, 1999)(Grady, J.)("Under our system of notice pleading, however, we will not strike (or dismiss) pleadings for mere imprecision, so long as

---

[8] The issue of whether the "prevent" language also precludes PCP from charging a royalty to Jac's customers is discussed below.

they reveal the nature of the claim. . . . Because we can divine [the underlying grounds of defendant's affirmative defense] from the pleadings, we need only determine whether, if true, they would defeat [plaintiff's claims].") *See also Sterling v. Riddle*, No. 99 C 2678, 2000 WL 198440 at *4 (N.D. Ill. Feb. 11, 2000)(Conlon, J.) ("The requirements of Rule 8(c) are not absolute. Defendants may belatedly assert affirmative defenses as long as the plaintiff had adequate notice of the defense and was not deprived of the opportunity to respond"). In this case, PCP had notice of the defense and opportunity to respond. (*See, e.g.,* PCP's Mem. Opp'n. Jac's Mot. Summ. J. at 6-7; PCP's Reply Brief Supp. Mot. Summ. J. at 11.) Under these circumstances, Jac has sufficiently raised the issue of the Settlement Agreement as a defense to PCP's claims, and PCP and Casagrande have had a full opportunity to respond to that issue in the summary judgment papers submitted by the parties.

In March, 1995, Yeager and Casagrande filed the '023 Application. (PCP's LR Ans. ¶ 8.) In May 1995, Casagrande entered into the 1995 Agreement with Jac. (1995 Agreement at JAC 00387.) Absent an express agreement to the contrary, co-inventors "presumptively own[] a pro rata undivided interest in the entire patent." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1466 (Fed. Cir. 1998). The co-owner of a patent has the right to license the patent without the participation of the other owners. (*Id.*) A license in a patent can be granted prior to application for the patent. *Boggild v. Kenner Products*, 776 F.2d 1315, 1316 (6th Cir. 1986). Casagrande's rights in the patent that ultimately issued were subsequently purchased by PCP. PCP thus took the patent rights subject to the license. In *California Packing Corp. v. Sun-Maid Raisin Growers*, 64 F.2d 370, 374-375 (C.C.P.A. 1933)(predecessor court to the United States Court of Appeals for the Federal Circuit), the court held that when a trademark is transferred between corporations the new owner takes the trademark subject to any limitations agreed to by the prior owner with third parties,

including agreements not to enforce the trademark against a certain party. The court stated, "It would seem inequitable to hold that appellee might reap the benefits of said contract but not assume any of its burdens." *Id.* at 374. The proposition was stated even more explicitly in *American Dirigold Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 452 (6th Cir. 1942). In *American Dirigold*, the court explained, "Any person acquiring by assignment or license an interest in such invention or authorship takes title subject to prior assignments or licenses of which the assignee must inform himself as best he can and at his own risk." *Id.; see also Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*, 565 F. Supp. 931, 939 (D.C.N.J. 1983 )("[T]he purchaser of a patent takes subject to outstanding licenses"). As a result, PCP is bound by the license Casagrande granted Jac.

Thus, Jac's motion for summary judgment is granted as to PCP's counterclaim for patent infringement on the ground that PCP's patent infringement claims against Jac are barred by the Settlement Agreement. This ruling necessarily also disposes of PCP's motion for summary judgment in its favor against Jac on PCP's counterclaims, which is denied. It is important to note, however, that this does not constitute any ruling with respect to the other three grounds on which Jac moved for summary judgment on PCP's counterclaim, and particularly, does not constitute a ruling regarding the validity or invalidity of the '037 Patent.

## II. Casagrande's Motion For Summary Judgment On Jac's Claim of Breach of Contract

Count I of Jac's First Amended Complaint is a breach of contract claim against Casagrande, alleging breach of the 1995 Agreement and Settlement Agreement. (First Am. Compl.) Jac alleges that Casagrande is president of PCP and its majority shareholder. (First Am. Compl. ¶ 7.) Jac also alleges that "PCP's economic coercion of Jac's customers was done at the direction of Casagrande

and constitutes interference with Jac's customers in breach of the Agreement and the Settlement Agreement. . . . PCP's assertion that if Jac sells Transfer Tape Products it is infringing PCP's process patent also constitutes interfering with Jac's customer relationships." (*Id.* ¶ 22.)

In moving for summary judgment, Casagrande argues that PCP's actions in asserting its patent rights against Jac and in demanding that Jac's customers buy their two-liner transfer tape from PCP or pay PCP a royalty is not actionable and is not prohibited by the Settlement Agreement. As discussed above, PCP's counterclaim against Jac for patent infringement is barred by the Settlement Agreement. Casagrande expressly agreed to be bound by that Agreement. Casagrande's motion for summary judgment on the basis that the Settlement Agreement does not prohibit enforcing the patent against Jac is denied.

Whether Casagrande violated the Settlement Agreement through PCP's communications with Jac's customers is a more complex issue. As Casagrande and PCP argue with respect to Jac's state law claims against PCP, the Federal Circuit has held that state law claims regarding communications about patent rights raise considerations of federal law. "To the extent that conflict arises in the interaction between state commercial law and federal patent law, federal law must be applied." *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 896 (Fed. Cir. 1998).

> [F]ederal law requires a showing of bad faith in order to bar such communications. Communication of accurate information about patent rights, whether by direct notice to potential infringers or by publicity release, does not support a finding of bad faith.

*Id.* at 898.

Although the determination of bad faith may encompass a number of considerations, both subjective and objective, generally, a threshold showing of incorrectness or falsity, or disregard for either, is necessary. *Id.* at 897. In the case at hand, the facts presented show that in December 1999,

24

just nine months after signing the Settlement Agreement expressly incorporating a provision stating, "During and after the termination of this agreement, Jac shall not be prevented by UCT or the Intervenants hereto from selling Free Film . . . to the Customers or any customer whatsoever," Casagrande, through PCP, informed customers that "[i]f customer wants to buy [Free Film] from Jac, a royalty basis license needs to be negotiated with Precision Coated Products." (Steidinger Dep. at 33, attached to Jac's LR Appx.) Because Casagrande and PCP took the position in their papers that the Settlement Agreement had no impact on their ability to enforce the '037 Patent, a position that this court has rejected, they have not demonstrated conclusively for purposes of summary judgment that PCP's communication to Jac's customers, including the demand for a royalty if the customer uses Jac's Free Film, could not be considered false or inaccurate in light of the license granted to Jac in the Settlement Agreement. None of the cases cited by the parties deals with a situation parallel to the facts of the present case. The Federal Circuit has stated:

> Exactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, if a patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out.

*Zenith Electronics Corp. v. Exzec, Inc*, 182 F.3d 1340, 1354 (Fed. Cir. 1999). A motion for summary judgment may not be granted unless there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On this state of the record, summary judgment in favor of Casagrande is not appropriate.

### III.    PCP's Motion for Summary Judgment on Jac's Claims

#### A. Count II

Jac's Count II is brought under the Sherman Act, 15 U.S.C. § 1 *et seq*., and alleges that PCP

has illegally tied the use of the '037 process to the purchase of two-liner transfer tape from PCP.

(First Am. Compl. ¶ 30.) In *Dawson Chem. Co. v. Rohm & Hass Co.*, 448 U.S. 176, 200-201 (1980),

the Supreme Court held that patent owners may control the sale of non-staple goods whose use is

infringing. They may not, however, tie the purchase of a staple product to the purchase of a patented

product or license for a patented process. (*Id.*) Title 35 U.S.C. § 271(d) provides that patent holders

shall not be guilty of illegal extension of their patent rights for actions that "if performed by another

would constitute contributory infringement" or for enforcing their patent rights against those who

are contributory infringers. *Dawson,* 488 U.S. at 201, held that "the provisions of § 271(d)

effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to

exclude others from competition in nonstaple goods."

Subsequent to *Dawson,* Section 271(d) was amended to include a fifth subsection. Section

271(d)(5) provides that a patent owner is shielded from an allegation of patent misuse when the

owner "conditioned the license of any rights to the patent or the use of the patented product on the

acquisition of a license to rights in another patent or the purchase of a separate product, unless, in

view of the circumstances, the patent owner has market power in the relevant market for the patent

or the patented product on which the license or sale is conditioned."

Jac argues that § 271(d)(5) and the case of *Eastman Kodak v. Image Technical Services*, 504

U.S. 451 (1992), had the effect of overturning *Dawson*'s rule for non-staple goods and requires that

courts perform a factual analysis of the competitive effect of the tying arrangement in every case.

It is not necessary to reach that argument however, because the record reflects a genuine issue of fact regarding whether PCP's actions are contrary to the antitrust law under either party's interpretation of § 271(d).

To be entitled to summary judgment on Count II, under its own interpretation of *Dawson* and § 271(d), PCP must show that there is no genuine factual dispute that two-liner transfer tape is a non-staple good. A non-staple good has been defined as "one which was designed to carry out the patented process and has little or no utility outside the patented process." *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989). In contrast, a staple good is one "that was not specifically designed for use with the patented process and has substantial, efficient and feasible uses outside of the patent." *Id.* The Seventh Circuit, for example, has identified ink for a mimeograph machine as a typical staple product that can not properly be tied to a patented process. *USM Corp. v. SPS Tech., Inc.*, 694 F.2d 505, 510 (7th Cir. 1982). It also has been held that "occasional aberrant use of a product that is clearly designed to be used in a particular manner . . . does not make [a device] a staple article." *Dennision Mfg. v. Ben Clements and Sons Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979) (internal citations omitted). Whether an item is a staple or not is a question of fact. *Hodosh v. Block Drug Co., Inc.*, 833 F.2d 1575, 1579 n.12 (Fed. Cir. 1987.) The *Polysius* case, 709 F. Supp. at 563, involved a patented process for crushing minerals. The court observed that while the machinery to carry out this process could be used for other purposes it was not economically feasible to do so and only one corporation was using the machinery other than for the patented process. *Id.* at 575.

PCP argues that Jac's admissions in its interrogatories and responses to PCP's Local Rule 56.1 Statement of Undisputed Fact eliminate any question of fact. Jac has stated that it sells Free

Film products "exclusively to manufacturers of integrated label business forms and/or to intermediaries who in turn sell it to" such manufacturers. (Jac's LR Ans. ¶ 32.) PCP also cites deposition testimony in which Joseph Fuhrman, Jac's current president, states that he is not aware of any use for Free Film other than making a business form with an integrated label. (Fuhrman Dep. at 132/9-13, attached to Jac's LR Appx.) In response to PCP's interrogatory asking Jac to identify all entities that used the '037 process and Jac's communications with these entities, Jac responded by quoting an allegation from PCP's complaint: "All current and past manufacturers of integrated label business forms produce those forms by the process described in claim 1 of the '037 patent." (Jac's Supp. Answers to PCP's First Set of Interrogs., attached at Tab (B)(6), ¶ 6 to PCP's Ans. Appx.) Jac argued in its Response to PCP's Local Rule Statement that its interrogatory answer was not an admission but "merely a quotation of PCP's allegation." (Jac's LR Ans. ¶ 36.)

On the other hand, Yeager testified that Free Film could be used to make business forms without infringing the '037 Patent, and that PCP has three customers who use this process. (Yeager Dep. at 169/14-170/24, attached to Jac's LR Appx.)[9] Yeager stated that "There is a machine mad[e]

---

[9] PCP's response to Jac's Local Rule Statement about this testimony, as well as its response to many of Jac's other Local Rule statements, substantially consists of argument, which is not an appropriate response to a LR 56.1 statement. (*See, e.g.*, PCP's LR Ans. ¶¶ 33-34.) This court's website Case Management Procedures dealing with summary judgment motions states:

> The responses to fact statements must refrain from argument. The significance or lack of significance of a disputed or undisputed fact may be argued in the respondent's legal memorandum. If a particular fact is "undisputed," nothing more should be said in the response. If a particular fact assertion is "disputed" in whole or part, the response must state what part of the assertion is disputed and must contain a specific citation to the supporting affidavits, depositions or other materials as well as to the tab(s) in the compendium where those materials may be found. *Failure to provide support for an alleged fact dispute may result in that fact being deemed admitted.*

by Vandenberg Engineering which can make a business form with an integrated label using two-line transfer tape not utilizing the process of PCP." (*Id.* at 169/20-23.) Yeager stated that three of PCP's clients, Hospital Forms, Monarch Press and two locations of USA/docufinish, use this machine. (*Id.* at 170/7-8.) PCP's sales records provide evidence that the purchases of these customers are not so "aberrant" as to eliminate a question of fact regarding non-infringing uses for Free Film. (Strata-Tac Sales by Customer at PCP 0167, PCP 0177, attached at Tab 22 to Jac's LR Appx.) Likewise, Jac's former president, Hickman, testified that there are some other uses of Free Film, for example, with fancy wine labels, although he apparently did not quantify this use. (Hickman Dep. at 270/21-271/21, attached to Jac LR Appx.)

PCP admits that "a very small amount of two liner transfer tape may be used in another manner," but argues that there are no substantially non-infringing uses. (PCP's LR Ans. ¶ 34.) Viewed in the light most favorable to the non-movant, Jac, Yeager's deposition testimony and PCP's sales for other purposes raise a genuine issue of material fact. As a result, summary judgment is inappropriate.

## B.    Counts III and IV

Count III alleges that "PCP's tying conduct violates the Illinois Uniform Deceptive Trade Practices Act in that it is designed to unfairly exclude Jac from the market for Transfer Tape Products." (First Am. Compl. ¶ 34.) Count IV alleges that PCP's intentional "tying conduct constitutes a tortuous [*sic*] interference with Jac's relationships with its customers, and Jac's prospective economic advantage arising out of those relationships." (*Id.* ¶ 36.)

(<www.ilnd.uscourts.gov/JUDGE/BROWN/gsbpage.htm> (emphasis in original).)

PCP argues that, as to Count III, Jac has not plead or shown any of the acts prohibited by the IUDTPA. (PCP's Mem. Supp. Summ. J. on Jac's Claim at 14-15.) Jac argues that PCP's allegations of patent infringement constitute disparagement "by false or misleading representations of fact." (Jac's Resp. to PCP's Mot. Summ. J. on Jac's Claim at 11.)

The IUDTPA lists twelve prohibited actions including disparaging the goods, services or business of another through "false or misleading misrepresentations of fact." 815 ILCS § 510/2. The IUDTPA "is intended to deal with conduct involving either misleading trade identification or false or deceptive advertising. In other words, the Act is directed towards unfair competition and acts which unreasonably interfere with another's conduct of his business." *Indust. Specialty Chem., Inc. v. Cummins Engine Co. Inc.*, 902 F. Supp. 805, 813 (N.D. Ill. 1995)(internal quotations omitted). The court in *Mitsubishi Electric Corp. v. IMS Tech., Inc.*, No. 96 C 499, 1997 WL 630187, *7 (N.D. Ill. Sept. 30, 1997)(Williams, J.), held that "bad faith assertions of patent infringement can amount to a violation of the Deceptive Practices Act." The court further held that the plaintiff's allegation that the defendants "knowingly and wrongfully" asserted a patent obtained by fraud was sufficient to allege bad faith for the purposes of the IUDTPA. *Id.*

With respect to both Counts III and IV, as discussed above, federal patent law "bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show the patentholder acted in bad faith." *DCI Marketing, Inc. v. Justrite Mfg. Co.*, 213 F. Supp.2d 971, 972 (E.D. Wis. 2002). The Federal Circuit, in the *Zenith* case, considered a claim under Illinois law for tortious interference with prospective economic advantage, holding that "to avoid patent law preemption of . . . state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Zenith Electronics Corp.*, 182 F.3d at 1355. Jac

30

argues that its tortious interference claim is not preempted by federal law because "read as a whole, the allegations of Jac's First Amended Complaint alleged bad faith." (Jac's Resp. to PCP's Mot. Summ. J. on Jac's Claim at 11.) What constitutes bad faith is determined on a case by case basis. *Zenith*, 182 F.3d at 1354. PCP reads the case law too narrowly in arguing that Jac must plead and support the position that "PCP is enforcing its patent rights while PCP *knows* that its patent rights are unenforceable." (PCP's Reply Supp. PCP's Mot. Summ. J. on Jac's Claims at 2 (emphasis in original).) As indicated by the Federal Circuit in *Zenith*, a patentee may believe that its patent is valid and yet make actionable statements. *Zenith*, 182 F.3d at 1354-55 (statement that Exzec's product infringes Zenith's patent and statement that Exzec could not design around Zenith's patent are both potentially actionable, noting that under *Mikohn*, 165 F.3d at 897, "bad faith" may encompass the particular statements as well as subjective and objective considerations).

As discussed above, at this state of the record it is not possible to conclude, under the standards applicable to summary judgment, that Jac could not show bad faith so as to prevail on its claim against PCP for violation of the IUDTPA or for common law interference with economic advantage. For that reason, PCP's motion for summary judgment as to Count III and IV is denied.

## IV. The Motions To Strike

Jac moved to strike a portion of the prayer for relief contained in PCP's reply to Jac's summary judgment motion, which asks for summary judgment in PCP's favor on Jac's defense of invalidity to PCP's counterclaim. (Jac's Mot. to Strike.)[Dkt# 117.] Jac also seeks to strike PCP's Supplemental Statement of Undisputed Facts, arguing among other reasons that through the supplemental statement PCP is attempting to convert its response to Jac's summary judgment motion

to a cross motion for summary judgment. *Id.* Because summary judgment is entered against PCP on its counterclaim against Jac for patent infringement without a ruling on the validity of the '037 Patent, Jac's motion to strike is denied as moot.

PCP also moved to strike certain of Jac's summary judgment submissions, specifically ¶¶ 22 and 23 of Jac's Local Rule statement and its referenced Exhibit 11, which contains a claims chart as well as materials relating to an affidavit by Robert McCreary, a witness who was not disclosed by Jac. (PCP's Mot. to Strike.)[Dkt # 108.] All of these materials relate to that portion of Jac's motion for summary judgment that argued that the '037 Patent is invalid because it was anticipated by prior art. Because Jac's summary judgment motion was granted on other grounds, PCP's motion to strike is denied as moot, without ruling on whether such a motion to strike would be granted should the materials appear in connection with any future motion.

Finally, Casagrande moved to strike certain portions of Jac's Statement of Undisputed Facts, on the ground that those statements have no relevance to his motion for summary judgment. (Casagrande's Mot. to Strike.)[Dkt# 122] The relevance of some of the statements subject to Casagrande's motion is arguable. For example, as discussed above, the inventor's position on whether there are other uses for Free Film is arguably relevant to the intention behind the "prevent" language in the Settlement Agreement. However, in his response to those statements, Casagrande simply incorporated PCP's responses. (Casagrande's LR Ans. ¶¶ 2, 3, 24-33.) Thus, it does not appear that Casagrande incurred any prejudice or undue expense in responding to those statements. Casagrande's motion to strike is denied.

## CONCLUSION

For the foregoing reasons, Casagrande's Motion for Summary Judgment [dkt# 100] is DENIED, PCP's Motion for Summary Judgment on its counterclaim that Jac has infringed its patent [dkt# 96] is DENIED, Jac's Motion for Summary Judgment on PCP's counterclaim [dkt# 101] is GRANTED, PCP's Motion for Summary Judgment on Jac's claim [dkt# 97] is DENIED, and the Motions to Strike by Jac, PCP and Casagrande are DENIED. [Dkt## 108, 117, 122.]

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: March 24, 2003**